IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                                   **4:19-CR-00631-JM**

**ANTHONY OBI, JR**

## ORDER

Before the Court is Defendant's Motion for Judgment of Acquittal and for New Trial (Doc. Nos. 42, 43). The Government has responded. (Doc. No. 49). For the reasons set out below, the motion is DENIED.

### I.    BACKGROUND

The Government alleged that Defendant shot at a vehicle that contained four people, one of whom was the mother of his child with whom Defendant had argued with earlier in the day. The evidence at trial established that although no gun was found, officers found five shell casings on the ground where the shooting occurred within twenty-five minutes of the shooting. Those casings matched the .45 caliber slug found in the vehicle. Additionally, the four eyewitnesses in the vehicle – Alexandria Bogan, Myesha Kinard, Antonio Williams, and Jennifer McCranie – testified that they saw Defendant pull a gun from his pants and shoot at them.

During trial, Defendant's lawyers argued that the eyewitnesses were not reliable, and they questioned why law enforcement officers never got a search warrant for Defendants house. After a two day trial, a jury convicted Defendant of being a felon in possession of ammunition on August 25, 2020. (Doc. No. 41).

In the pending motion, Defendant argues that he is entitled to a judgment of acquittal because the Government allegedly conceded that law enforcement did not have probable cause to get a search warrant for Defendant's home. He asserts that he is entitled to a new trial because he was not permitted to fully impeach the testimony of two witnesses.

## II. DISCUSSION

### A. Probable-Cause Defense

Defendant contends that he is entitled to judgment of acquittal because the Government admitted at trial that it could not prove its case beyond a reasonable doubt. Specifically, Defendant asserts that "[b]y conceding that its proof did not meet the burden of probable cause, the government has also conceded the proof does not meet the beyond a reasonable doubt standard." (Doc. No. 43). First, Defendant presented this probable-cause/search-warrant theory to the jury during cross-examination and closing. (Doc. No. 48 at pp. 258, 302-304). Obviously, the jury rejected Defendant's theory. Second, the fact that officers might not have probable cause to search Defendant's house (which he was not in at the time of the shooting) is unrelated to whether the Government could establish beyond a reasonable doubt that Defendant was a felon in possession of ammunition when he stood in the street and shot at an occupied vehicle.

### B. Impeachment Witnesses

Defendant asserts that he is entitled to a new trial because he was not allowed to fully impeach Antonio Williams and Jennifer McCranie, who testified inconsistently with statements they gave Detective Todd Davis and Defendant's investigator, Dana Harrison. Defendant wanted to call Detective Davis and Ms. Harrison so that he could further impeach Mr. Williams and Ms. McCranie. Specifically, Defendant wanted to ask them about statements they took from the witnesses and show that those statements were inconsistent with what the witnesses said on the stand.

Regarding the investigator, the parties invoked Federal Rule of Evidence 615 at the start of the trial (Doc. No. 47, pp. 14-15). This rule provides for the exclusion of witnesses "to prevent witnesses from tailoring their testimony to that of prior witnesses and to aid in detection of dishonesty." *United States v. Brooks*, 715 F.3d 1069, 1080 (8th Cir. 2013) (quoting *United States v. Vallie*, 284 F.3d 917, 921 (8th Cir.2002)). Ms. Harrison had been in the courtroom throughout the trial. (Doc. No. 48, pp. 281-282). Defendant failed to offer a compelling reason

to allow her to testify in contravention of the rule, and this witness was properly excluded for all purposes, including impeachment.

As to Detective Davis, Defendant argues that he was prevented from putting forth "one of his main theme" that the eyewitnesses' memories were unreliable and changing by "highlight[ing] for the jury" that Mr. Williams was "inconsistent in the degree" to which he knew Defendant. (Doc. No. 43, p.5).  However, this evidence what already introduced when Mr. Williams was on the stand.  Mr. Williams testified "I don't actually know [Defendant], but I seen him in passing at Alexandria's house."  (Doc. No. 47, p. 67).  On cross-examination, defense counsel elicited the following testimony:

> Q: You have never met Anthony?
> A: I saw him in passing coming out the house and I was going in.
> Q: You told Detective Davis, I have never met Anthony Obi.
> A: Met him as in met him, but I have saw him.
> Q: In that interview with Detective Davis where you tried to be as truthful as you could, you told him I have never met Anthony Obi?
> A: Okay, I'm saying I never had interaction with him.
> . . . .
> Q: You don't know Anthony Obi?
> A: I don't know him.
> Q: You don't know him personally?
> A: No.
> Q: You don't know him at all?
> A: I don't know him, but I know what he looks like.

(Doc. No. 47, p.79).  The Government objected to the cumulative nature of continued questioning on this issue.  Following a brief bench conference at which the Court asked defense counsel to summarize his point, the following exchange occurred:

> Q: In your interview with Detective Davis, on four separate occasions you told him some version of "I have never met him" or "I do not know Anthony Obi." Right?
> A: I don't recall. I don't recall.
> Q: You don't remember saying that to him in your official police interview with him?
> A: I told him I don't know him.

3

(Doc. No. 47, p. 82).

When Detective Davis was on the stand, there was a bench conference regarding the application of Rule 613(b).  Although defense counsel argues that he was not permitted to pursue the line of questioning in the detail that he wanted, the following was permitted:

> Q: I'm going to come up and show you the transcript of the statement.
> A: Okay.
> Q: Page numbers and then some line numbers that I'm going to refer to.
> A: Okay.
> Q: Can you turn to page 2, I think it's about line 18?
> A: Yes, sir.
> Q: And Mr. Williams told you, "I've never met Anthony Obi"?
> A: That's correct.
> Q: And he said essentially the same thing to you again on page 3, line 16?
> A: Correct.
> Q: And he said it again to you page 4, line 22?
>
> . . .
>
> A: Yes.
> Q: Okay. And then finally at the end of the interview, he told you, "I don't know him at all." Page 7, line 1.
> A: Yes, sir.

Despite the arguments in the pending motion, the record reflects that defense counsel was allowed to fully impeach Mr. Williams on perceived inconsistencies between what Mr. Williams said on the stand versus what he said in his statement to Detective Davis.  Defendant has not come forward with any additional impeachment evidence he would have offered on this issue.

Defendant also wanted to impeach the testimony of eyewitness Jennifer McCranie using the testimony of Detective Davis.  Specifically, Defendant asserts that Ms. McCranie testified that she had seen Defendant earlier in the evening at Alexandria Bogan's house but "she never said anything about that in her statement to Detective Davis." (Doc. No. 43, p. 6).  This fact was made clear from Ms. McCranie's testimony, so allowing Defendant to also question Detective Davis on the inconsistency would have been cumulative. Ms. McCranie testified that she looked out a bedroom window and saw Defendant at the door.  The Government asked if she had told

that to the police, and she responded "I don't know if I mentioned that I actually seen him because I looked out of her daughter's bedroom window." (Doc. No. 47, p. 141).

During Ms. McCrainie's cross-examination, defense counsel repeatedly pointed out that Ms. McCrainie never told the police that she had seen Defendant at Ms. Bogan's house the night of the shooting:

> Q: And you also just stated that you'd seen Anthony outside the house that evening, right?
> A: He came over before Alexandria went to the store.
> Q: You never mentioned that in your statement, did you?
> A: It was -- she called and asked to go to the store.
> . . . .
>
> Q: Okay. And you just in court today testified that you saw Anthony Obi at Alexandria's house that day, correct?
> A: I seen him, yes.
> . . . .
>
> Q: Nowhere in your statement -- I mean, you never told any police officer that, right?
> A? I just thought about the ride to the store.
> Q: Well, this is the first time anybody's heard that you saw him prior to the shooting, correct?
> A: When we arrived at Alexandria's home.
> Q: You never told any police that, right?
> A: It just -- at that moment, I was worried about taking her to the store and the shooting.
> Q: You met with the prosecution at least three times, right, and that's never come up then?
> A: It just wasn't never a factor to me because I was worried about the shooting.
> . . . .
>
> Q: Okay. So you never mentioned to anybody that you saw him earlier in the evening, correct?
> A: After the shooting, I just -- I did not remember.
> . . . .
>
> Q: You never told anybody that he was outside, right?
> A: I just -- I didn't -- like he knocked on the door and Alexandria told us to call the police. And he knocked and he left. And we got in the car and we took her to the store and the store was closed and we left the store and come back.

5

> Q: That's your testimony?
> A: Yes.

(Doc. No. 47, pp. 152, 156-157, 159-160, 162-163).

Defense counsel asked Ms. McCranie six times regarding whether she told police she'd seen Defendant at Ms. Bogan's house the night of the shooting. Although the witness never answered with a straight, "That's correct, I never told anybody that I had seen him earlier in the evening," the responses made this clear; Ms. McCranie had not told the police that she had seen Defendant earlier in the evening. In other words, defense counsel clearly made the point on the record they claim they were not permitted to make.

Furthermore, the Court allowed Defendant to ask Detective Davis limited questions regarding prior inconsistencies. (*See* Doc. No. 48 at p. 245-246). Anything beyond the questions the Court permitted would have been duplicative. Finally, additional impeachment of these witnesses is insufficient to overcome the totality of the evidence supporting the jury's verdict.

## CONCLUSION

Based on the findings of fact and conclusions of law above, Defendant's Motion for Judgment of Acquittal and for New Trial (Doc. Nos. 42, 43) is DENIED.

IT IS SO ORDERED this 1st day of December, 2020.

_____
UNITED STATES DISTRICT JUDGE